**Violeta Recio KALAW, Petitioner,**

v.

**Benedict J. FERRO, As District Director of the Buffalo District Office of the Immigration and Naturalization Service, Respondent.**

No. CIV–86–1155C.

United States District Court,
W.D. New York.

Jan. 13, 1987.

Grashow, Berger & London (Michael B. Berger, of counsel), Williamsville, N.Y., for petitioner.

I.N.S. (James W. Grable, District Counsel, of counsel), Buffalo, N.Y., for respondent.

CURTIN, Chief Judge.

The petitioner seeks a preliminary injunction enjoining her deportation by respondent until such time as she can apply for legalization, or have administrative review of her interim application for legalization, under the recently enacted Immigration Reform and Control Act of 1986, 8 U.S.C. § 1255A.[1]

The petitioner is a citizen of the Philippines, and graduated with an M.D. degree from the University of St. Tomas in the Philippines in 1969. She first entered the United States in July, 1973, and trained as a medical intern at Hutzel Hospital in Detroit, Michigan, through June, 1974. She thereafter entered a residency in psychiatry and child psychiatry at the Lafayette Clinic in Detroit from 1974–79. At present, the petitioner is employed as a Staff Psychiatrist at the Fairmount Children's Center in Solvay, New York, and as a Consulting Child and Adolescent Psychiatrist for Catholic Charities of Syracuse, New York.

The history of petitioner's immigration status in the United States is as follows. The petitioner last entered the United States under the classification of a nonimmigrant J–1[2] exchange visitor. She was authorized to remain in the country in that

1. This action was originally brought as a petition for writ of habeas corpus (Item 1). Petitioner was subsequently permitted to expand the petition into an application for injunctive relief independent of the habeas relief (Item 9, p. 1).

2. See 8 CFR § 214.2(j).

status until June 30, 1979. On July 6, 1979, she was granted a change of status to a nonimmigrant H–1 [3] temporary worker of distinguished merit, effective to June 30, 1980.

The petitioner thereafter received two one-year extensions of her H–1 status from the Detroit District Office of the Immigration and Naturalization Service [Detroit INS], the last extension effective until June 27, 1982. Principally at issue in this action, as discussed below, is whether the petitioner's work at the time of these extensions exceeded what was lawful under H–1 status and whether this was known to the Government at that time.

On February 22, 1982, the Buffalo District Office of the Immigration and Naturalization Service [Buffalo INS] denied a petition by the Hutchings Psychiatric Institute in Syracuse, New York, to hire petitioner as an H–1 temporary worker. Buffalo INS informed petitioner at that time that she remained in authorized nonimmigrant status until June 27, 1982. On January 31, 1983, Buffalo INS granted petitioner the privilege of departing voluntarily

from the United States on or before April 1, 1983. Petitioner sought asylum, and at a deportation hearing on May 30, 1985, asylum was denied, and petitioner was found deportable. Petitioner's appeal of that decision was dismissed by the Board of Immigration Appeals on July 31, 1986.

On November 6, 1986, the President signed into law the Immigration Reform and Control Act of 1986 [Reform Act]. Title II adds a new section 245A to the Immigration and Nationality Act, providing for the legalization of aliens who entered the United States prior to January 1, 1982. Section 245A(a)(2)(B) [4] of the Reform Act provides that an alien admitted as a nonimmigrant, like the petitioner, is eligible for legalization if she was in unlawful status before January 1, 1982, and the Government knew of her unlawful status as of such date. Section 245A(f) provides for a single level of administrative appellate review from a denial of an application for legalization. The basis of this review includes "such additional or newly discovered evidence as may not have been available at the time of the [original] determination." [5]

---

3. See 8 CFR § 214.2(h). Petitioner's H–1 classification was dependent upon satisfaction of the requirements applicable to an alien graduate of a foreign medical school. Those requirements are set forth at § 214.2(h)(2)(iv):

> (iv) *H–1 classification for alien graduates of foreign medical schools.* A petitioner seeking to have a physician who graduated from a medical school in a foreign state classified under section 101(a)(15)(H)(i) of the Act must establish that the beneficiary is coming to the United States primarily to teach or conduct research, or both, at or for a public or non-profit private educational or research institution or agency at the invitation of the institution or agency. The petitioner must also submit documents which establish that any patient care activities by the beneficiary are incidental to the physician's teaching or research. A physician who graduated from a medical school in a foreign state who is of national or international renown in the field of medicine is exempt from this requirement.

4. Section 245A(a)(2)(B) provides in full:

> (B) NONIMMIGRANTS.—In the case of an alien who entered the United States as a nonimmigrant before January 1, 1982, the alien must establish that the alien's period of authorized stay as a nonimmigrant expired before such date through the passage of time or the

alien's unlawful status was known to the Government as of such date.

5. Section 245A(f) provides in full:

> (f) ADMINISTRATIVE AND JUDICIAL RE-VIEW.—
> (1) ADMINISTRATIVE AND JUDICIAL REVIEW.—There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection.
> (2) NO REVIEW FOR LATE FILINGS.—No denial of adjustment of status under this section based on a late filing of an application for such adjustment may be reviewed by a court of the United States or of any State or reviewed in any administrative proceeding of the United States Government.
> (3) ADMINISTRATIVE REVIEW.—
> (A) SINGLE LEVEL OF ADMINISTRATIVE APPELLATE REVIEW.—The Attorney General shall establish an appellate authority to provide for a single level of administrative appellate review of a determination described in paragraph (1).
> (B) STANDARD FOR REVIEW.—Such administrative appellate review shall be based solely upon the administrative record established at the time of the determination on the

The petitioner is unable to formally apply for legalization under the Reform Act at the present time; the formal application period provided for under section 245A(a)(1), and section 245A(e)(2) of the Reform Act does not commence until a date still to be determined in 1987 ("not later than 180 days after the date of enactment," section 245A(a)(1)(A), Item 5, ¶ 29). However, Congress provided for an interim procedure for aliens apprehended prior to the formal application period: under section 245A(e)(1) of the Reform Act, if an alien can establish a *prima facie* case of eligibility for legalization under the Act, then until such time as she can formally apply for legalization under section 245A(e)(2) she "may not be deported and shall be granted authorization to engage in employment in the United States ...." [6] This interim procedure is herein referred to as an "interim application."

Petitioner's interim application was made to Buffalo INS on November 10, 1986 (Item 10, Exh. Q) and was denied by respondent on November 20, 1986 (Item 10, Exh. R). Respondent ordered petitioner to report to Buffalo INS for deportation to the Philippines on November 25, 1986.

On November 25, 1986, this court issued a Temporary Restraining Order preventing deportation pending a final determination on petitioner's application for a preliminary injunction. Oral argument was heard on December 15, 1986, and supplemental submissions were accepted on December 22, 1986. The court's order of December 29, 1986, extended the Temporary Restraining Order to January 9, 1987. On that date, the court granted an order of preliminary injunction, noting that this opinion would follow.

*Discussion*

The respondent has determined that petitioner failed to make a *prima facie* case for legalization and also contends that there is no basis for judicial review of the November 20, 1986, determination. However, the petitioner does not seek judicial review of respondent's determination; rather, the petitioner maintains that the Reform Act gives her the right to administrative appellate review of that determination. Petitioner asks this court to enjoin the respondent from deporting her until she has had the opportunity for such administrative review. The respondent acknowledges the jurisdiction of this court on

application and upon such additional or newly discovered evidence as may not have been available at the time of the determination.
   (3) JUDICIAL REVIEW.—
   (A) LIMITATION TO REVIEW OF DEPORTATION.—There shall be judicial review of such a denial only in the judicial review of an order of deportation under section 106.
   (b) STANDARD FOR JUDICIAL REVIEW.—Such judicial review shall be based solely upon the administrative record established at the time of the review by the appellate authority and the findings of fact and determinations contained in such record shall be conclusive unless the applicant can establish abuse of discretion or that the findings are directly contrary to clear and convincing facts contained in the record considered as a whole.

**6.** Sections 245A(e)(1) and 245A(e)(2) provide in full:
   (1) BEFORE APPLICATION PERIOD.—The Attorney General shall provide that in the case of an alien who is apprehended before the beginning of the application period described in subsection (a)(1)(A) and who can

establish a prima facie case of eligibility to have his status adjusted under subsection (a) (but for the fact that he may not apply for such adjustment until the beginning of such period), until the alien has had the opportunity during the first 30 days of the application period to complete the filing of an application for adjustment, the alien—
   (A) may not be deported, and
   (B) shall be granted the authorization to engage in employment in the United States and be provided an 'employment authorized' endorsement or other appropriate work permit.
   (2) DURING APPLICATION PERIOD.—The Attorney General shall provide that in the case of an alien who presents a prima facie application for adjustment of status under subsection (a) during the application period, and until a final determination on the application has been made in accordance with this section, the alien—
   (A) may not be deported, and
   (B) shall be granted authorization to engage in employment in the United States and be provided an 'employment authorized' endorsement or other appropriate work permit.

the application for preliminary injunction, but contends that the denial of an interim application for legalization is, under the Reform Act, not subject to administrative review, either.

These disputes require the court to construe the Reform Act even though no regulations have been promulgated as yet pursuant to the Act. Under these circumstances, I find the following.

First, it cannot be determined at this time that the Reform Act makes administrative appellate review inapplicable to interim applications, as respondent contends.

Second, for purposes of determining the application for preliminary injunction, the inquiry of the court is therefore, *inter alia,* whether the petitioner has shown sufficiently serious questions going to the merits to make them a fair ground for litigation upon administrative appeal. I find that the petitioner has clearly shown serious questions going to the merits of whether she established a *prima facie* case for legalization under the Reform Act.

I also find that the petitioner has shown the prospect of irreparable harm, and a balance of hardships tipping decidedly in her favor. As noted below, petitioner's deportation would make her ineligible for any subsequent application for legalization. With respect to the balance of hardships, this preliminary injunction will only require the INS to refrain from deporting petitioner until an administrative body which is to be formed in any case has been established and has made a determination respecting review of petitioner's interim application. On the other hand, petitioner faces the enormous hardship of deportation from the country where she has lived for the past 13 years. In addition, the record indicates that petitioner's skills as a child psychiatrist are in great demand in the Syracuse area, and her deportation would thus involve hardships for her community as well.

Petitioner has therefore satisfied the required showing for preliminary injunctive relief in this circuit. *Jackson Dairy, Inc. v. H.P. Hood and Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). Accordingly, petitioner's

application for preliminary injunction is granted, until such time as the administrative appellate authority provided for by section 245A(f) of the Reform Act determines whether it has jurisdiction to review the denial of petitioner's interim application, and issues its decision.

*The Applicability of Administrative Appellate Review to Interim Applications*

A reading of sections 245A(f)(1) and 245A(f)(3)(A) of the Reform Act, respecting administrative review, as applied to sections 245A(e)(1) and 245A(e)(2), respecting applications for legalization, is essential to a determination of this action.

Section 245A(f)(1) provides:

(f) ADMINISTRATIVE AND JUDICIAL REVIEW.—

(1) ADMINISTRATIVE AND JUDICIAL REVIEW.—There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection.

Section 245A(f)(3)(A) provides:

(3) ADMINISTRATIVE REVIEW.—

(A) SINGLE LEVEL OF ADMINISTRATIVE APPELLATE REVIEW.—The Attorney General shall establish an appellate authority to provide for a single level of administrative appellate review of a determination described in paragraph (1).

These sections, read together, direct the Attorney General to establish an appellate authority to provide for a single level of administrative appellate review of a determination *respecting an application for adjustment of status* under the Reform Act. This appellate authority has not yet been established.

The INS contends, as noted, that the language of these sections indicates that appellate review is applicable only to formal applications pursuant to section 245A(e)(2), not to what the court terms "interim applications" under section 245A(e)(1). The Reform Act gives no name to what the court calls the "interim application period;" rather, this period is simply

referred to as the period "before the beginning of the application period." The relationship which the Reform Act establishes between these two periods needs to be considered in full:

[Section 245A]

(e) TEMPORARY STAY OF DEPORTATION AND WORK AUTHORIZATION FOR CERTAIN APPLICANTS.—

(1) BEFORE APPLICATION PERIOD.—The Attorney General shall provide that in the case of an alien who is apprehended before the beginning of the application period described in subsection (a)(1)(A) and who can establish a prima facie case of eligibility to have his status adjusted under subsection (a) (but for the fact that he may not apply for such adjustment until the beginning of such period), until the alien has had the opportunity during the first 30 days of the application period to complete the filing of an application for adjustment, the alien—

(A) may not be deported, and

(B) shall be granted the authorization to engage in employment in the United States, and be provided an employment authorized' endorsement or other appropriate work permit.

(2) DURING APPLICATION PERIOD.—The Attorney General shall provide that in the case of an alien who presents a prima facie application for adjustment of status under subsection (a) during the application period, and until a final determination on the application has been made in accordance with this section, the alien—

(A) may not be deported, and

(B) shall be granted authorization to engage in employment in the United States and be provided an 'employment authorized' endorsement or other appropriate work permit.

■ Clearly, there is a near-identity between these sections and the periods they describe. Section 245A(e)(1), which the court terms the interim application period, appears to have one primary function: to allow an apprehended alien the right to make a *prima facie* showing *now* that can be processed later, when *"prima facie application"* for legalization begins under section 245A(e)(2). The statute thereby insures that an alien apprehended after enactment of the Reform Act, but before commencement of formal application, is treated the same as one apprehended after commencement of formal application. This intention would seem to be undermined if administrative review is provided only for the denial of an application under section 245A(e)(2). In sum, interim application and application appear distinguished only by an interval of administrative implementation, and there seems no rational basis for distinguishing between them on a matter like applicable review. I therefore find that it cannot be determined at this time that administrative appellate review is inapplicable to interim applications, as respondent contends.

■ An initial determination on this question is properly reserved to the administrative appellate authority itself. The difficulty of petitioner's situation is that if the appellate authority ultimately determines that it has jurisdiction to review decisions denying interim applications, petitioner's intervening deportation would make her ineligible for such review on other grounds.[7] Such deportation would therefore constitute irreparable injury for petitioner, and since petitioner can otherwise make the showing required for injunctive relief, her deportation must be enjoined until the appellate authority can make its determination on this issue.

*Petitioner's Prima Facie Case of Legalization under the Reform Act*

As noted, to establish entitlement to injunctive relief, petitioner must show serious questions going to the merits of wheth-

---

7. Section 245A(a)(3)(A) states:

(3) CONTINUOUS PHYSICAL PRESENCE SINCE ENACTMENT.—

(A) IN GENERAL.—The alien must establish that the alien has been continuously physically present in the United States since the date of the enactment of this section.

er she has established a *prima facie* case for legalization under the Reform Act. The court now turns to an assessment of petitioner's *prima facie* case.

Under section 245A(a)(2)(B) of the Reform Act, a nonimmigrant can establish *prima facie* eligibility for legalization on two bases. That section states:

(B) **Nonimmigrants**—In the case of an alien who entered the United States as a nonimmigrant before Jan. 1, 1982, the alien must establish that the alien's period of authorized stay as a nonimmigrant expired before such date through the passage of time *or* the alien's unlawful status was known to the Government as of such date.

(Emphasis added.)

Since the INS authorized petitioner to stay in the United States beyond January 1, 1982 (R–7), the petitioner cannot establish eligibility upon that basis. Petitioner contends that this authorization was in error and seeks to establish eligibility on the second basis.

Before assessing petitioner's *prima facie* case for legalization on the second basis, the court must give an initial construction to the phrases "unlawful status" and "known to the government." Neither of these phrases is defined by the Reform Act.

The respondent contends that "unlawful status" should be construed as equivalent to "deportable status." Such a construction of "unlawful status," however, would appear to collapse the two bases for legalization set forth in section 245A(a)(2)(B) to a single ground. The respondent argues that petitioner's unlawful status commenced when she exceeded her stay as a nonimmigrant in May, 1984, because she thereby became deportable under section 241(a)(2) of 8 U.S.C. § 1251(a)(2) (Item 9, p. 3; Item 5, ¶ 16). This flawed syllogism equates "unlawful status" with "exceeding authorized stay" to deduce the premise— that "unlawful status" equals "deportable" (as "exceeding authorized stay" equals "deportable"). However, the Reform Act dis-

tinguishes between exceeding authorized stay and unlawful status with an "or."

The petitioner, on the other hand, argues that until regulations are published which might more strictly define "unlawful status," the court should only ascribe to "unlawful" the meaning it has in common usage. Petitioner notes that if an alien's activity is not authorized under a particular nonimmigrant status by INS regulations, then the law specifies that she is to be denied that status. Petitioner thus argues that she was in the country in "unlawful" status if she regularly engaged in activity not authorized by INS regulations—*i.e.*, activity which should have made her ineligible for the status she held (Item 10, p. 18).

■ Within the circumstances of petitioner's case, this argument is persuasive. As discussed below, the INS regulations applicable to petitioner are clear: a graduate of a foreign medical school is not authorized for H–1 nonimmigrant status if she is engaged in more than incidental patient care. It is also clear that noncompliance with this restriction results in denial of H–1 status: it was precisely on this basis that an application to employ petitioner in H–1 status was denied *after* January 1, 1982, by Buffalo INS. I therefore find that, for purposes of assessing petitioner's *prima facie* case, petitioner's status was "unlawful" under the Reform Act if she regularly engaged in activity not authorized under H–1 status by INS regulations.

With respect to a construction of the phrase "known to the Government," the petitioner similarly argues that until regulations are published pursuant to the Reform Act, the court should ascribe to "Government" its broadest generic meaning. Thus, it is argued that if an agency of state or local government, for instance, knew of the petitioner's unlawful status, then the court should conclude that "the Government" knew. This is an important point for petitioner, because before January 1, 1982, the Michigan Department of Civil Service had the basis for such knowledge. On May 23, 1981, petitioner's em-

ployer, the Lafayette Clinic, notified the Michigan Department of Civil Service that the petitioner's appointment to the clinic had been terminated due to a reduction in force (Item 10, Exh. G). This state agency, therefore, clearly had knowledge of facts before January 1, 1982, which indicated that the petitioner was in violation of her H-1 temporary worker status.

■ However, petitioner does not claim, and nothing in the record indicates, that the INS or the United States Attorney General was informed of her termination of employment. The respondent therefore contends that this matter is irrelevant, because Congress could not have intended for "Government," as used in the Reform Act, to have the generic meaning advocated by petitioner. "Known to the Government," the respondent contends, can mean only "known to the United States Attorney General or the INS," because these are the only entities charged with administering the Reform Act, and are therefore the only entities whose knowledge is significant. At this stage, I find the argument of the INS to be the more persuasive one on this issue, though I note some reservations below.[8] It does appear to the court that the construction of "Government" advocated by petitioner would make administration of the Reform Act difficult.

In sum, then, to establish *prima facie* eligibility for legalization under the Reform Act, the petitioner must show that prior to January 1, 1982, she regularly engaged in activity not authorized under H-1 status by INS regulations, and that this fact was known to the United States Attorney General or the INS as of such date.

INS regulations require that the following must be established before an alien graduate of a foreign medical school can be approved for H-1 nonimmigrant status:

A petitioner seeking to have a physician who graduated from a medical school in a foreign state classified [H-1] ... must establish that the beneficiary is coming to the United States *primarily to teach or conduct research* .... The petitioner must also submit documents which establish that *any patient care activities by the beneficiary are incidental to the physician's teaching or research.*

8 CFR § 214.2(h)(2)(iv) (emphasis added).

On July 6, 1979, Detroit INS approved petitioner for H-1 nonimmigrant status. The approval was based upon representations contained in a Form I-129B petition and a supporting contract of employment, dated May 30, 1979. These documents indicated that petitioner was a physician and was to be employed by the Lafayette Clinic at Detroit, Michigan, in a research and teaching position (R-1). The employment contract was for a one-year period. These documents represented work duties which were clearly authorized under H-1 status. In particular, the supporting letter from the Lafayette Clinic to petitioner stated that she was offered employment as a "research and teaching psychiatrist," and that "[p]atients observed by you will be incidental to [these] research and training purposes ... and you will not be involved in any direct patient care and will have no patients of your own." (R-1.)

In June of 1980 and 1981, the Detroit INS approved one-year extensions of petitioner's H-1 status, on each occasion based upon an I-539 application from petitioner

---

**8.** While the court has here construed knowledge to the "Government" under the Reform Act to mean knowledge to "the United States Attorney General or the INS," in the future, such constructions will be significantly affected by yet-unpublished regulations. Thus, for instance, since the INS must maintain contact with many institutions and agencies to determine the eligibility of aliens to remain in the country, these regulations might foreseeably prescribe that notice to certain such agencies was thereafter "knowledge to the Government." The May 23,

1981, notice of petitioner's termination of employment sent by the Lafayette Clinic to the Michigan Department of Civil Service might, in that case, become immensely important. I believe that such considerations, while not going to the weight of petitioner's *prima facie* case, do testify to the importance of enjoining deportation, where there *is* serious evidence of a *prima facie* case, until the administrative appellate authority has had an opportunity to apply yet unknown regulations.

and a supporting letter from petitioner's employer (R–3 to R–6). Petitioner contends that these documents, especially the 1981 letter from her employer (the Lafayette Clinic) informed the INS that petitioner would have work duties involving more than incidental patient care, in violation of H–1 limitations.

Petitioner argues that performance of such work duties placed her in "unlawful status" before January 1, 1982, and that her unlawful status was known to the INS as of such date. The 1980 and 1981 supporting letters from the Lafayette Clinic mention, *inter alia*, that petitioner is a "staff psychiatrist," and that she "provides treatment recommendations for emotionally disturbed children." This duty is the first one mentioned in the 1981 letter. It is further stated that petitioner is "also involved in" teaching and research.

Petitioner's I–539 forms for 1980 and 1981 state as her reason for requesting an extension of her temporary stay the "necessity of continuing research, teaching and service" (1980) and "continuation of research work" (1981). Respondent points to the conflict between petitioner's 1981 form statement and the 1981 letter from the Lafayette Clinic. Respondent notes that the petitioner's 1981 form statement represents work duties that would be consistent with H–1 status, and that the 1981 letter should be read against that background. However, the letter from the Lafayette Clinic is clearly much more encompassing and detailed in its description than the four words of petitioner's 1981 form statement. In any event, this factual situation appears to clearly warrant administrative appellate review, especially under the Reform Act, where such review includes "such additional or newly discovered evidence as may not have been available at the time of the [original] determination." Section 245A(f)(3)(B).

The court notes that in later, similar circumstances involving petitioner, *Buffalo INS* required additional documents regarding petitioner's work, and then denied the H–1 application made on petitioner's behalf. On December 17, 1981, the Hutchings Psychiatric Center in Syracuse, New York, submitted a petition for H–1 employment of petitioner to Buffalo INS. It was stated without dispute at oral argument that Buffalo INS required additional information when it appeared that existing descriptions of petitioner's work might be in conflict. The subsequent evaluation by that office resulted in a decision denying this H–1 petition on February 22, 1982, for the reason that the record indicated that petitioner would be "primarily engaged in direct patient care for an indefinite period of time" (R–7). Petitioner's authorized H–1 status thereafter expired on June 27, 1982.

■ The employer letter from the Hutchings Psychiatric Center, to which Buffalo INS responded, does not as strongly indicate work duties violating H–1 limitations as does the 1981 letter from the Lafayette Clinic reviewed by Detroit INS (R–7). I therefore find that the 1980 and 1981 letters from the Lafayette Clinic introduce serious questions going to the merits of whether the Government knew of petitioner's unlawful status at that time and, thus, whether petitioner has presented a *prima facie* case for legalization under the Act.

For all the reasons stated above, the petitioner's application for a preliminary injunction is granted, until such time as the administrative appellate authority provided for under section 245A(f) of the Reform Act determines whether it has jurisdiction to review the denial of petitioner's interim application for legalization, and issues its decision.

So ordered.